IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| ELECTRALED, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>ASTERA LED TECHNOLOGY GMBH,<br>ASTERA MANUFACTURING LIMITED,<br>AND ASTERA DISTRIBUTION LIMITED,<br><br>    Defendants. | Case No. 2:24-cv-00512-JRG-RSP<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

  In accordance with the governing Amended Docket Control Order [Dkt. No. 51], and further in accordance with Local Patent Rule 4-5(a), Plaintiff ElectraLED, Inc. respectfully submits this Opening Claim Construction Brief.

  The Asserted Patent is U.S. Patent No. 7,651,245B2 (the "'245 Patent" or "the ElectraLED Patent" or "the Asserted Patent").

  The Asserted Claim is claim 21 of the '245 Patent.

  The terms identified by Defendant as requiring construction are presented below in the order they appear in the Asserted Claim.

## TABLE OF CONTENTS

I.    BRIEF TECHNOLOGICAL BACKGROUND SUMMARY ....................................................... 1

II.   LEGAL FRAMEWORK................................................................................................................ 2

III.   ARGUMENT................................................................................................................................ 4

    A. "a power supply residing within the rear receptacle" ['245 Patent, Claim 21] ............................4

    B. "wherein during operation, heat generated by the LEDs passes through the circuit board and then said heat is dissipated by the array of fins without the use of a fan" ['245 Patent, Claim 21]............................................................................................................5

IV.   CONCLUSION ............................................................................................................................. 10

# TABLE OF AUTHORITIES

**CASES**

*01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) .................................5

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*, 694 F.3d 1312, 1325-26 (Fed. Cir. 2012) ...............5

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1344 (Fed. Cir. 2016) ..........................7, 8

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004) .................................3

*Comaper Corp. v. Antec, Inc.,* 596 F.3d 1343, 1348 (Fed. Cir. 2010) ...................................3

*Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006)............................8, 9

*Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004)....................................10

*In re Downing*, 754 F. App'x at 996 .........................................................................8, 9

*Kara Tech Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009) .................................3

*Linear Tech Corp. v. ITC,* 566 F.3d 1049, 1057–58 (Fed. Cir. 2009) .........................................3

*Martek Biosci. Corp. v. Nutrinova, Inc.,* 579 F.3d 1363, 1381 (Fed. Cir. 2009)......................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014) ...............................7, 8, 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ................4, 5

*Optimum Imaging Techs. LLC v. Canon Inc.*, No. 2:19-CV00246-JRG, 2020 WL 3104290, at *9 (E.D. Tex. June 11, 2020) ..........................................................................................9

*Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005) ............................................3, 5

*Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017) .............................4, 10

*U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997)..............................................3

*US Foam, Inc. v. On Site Gas Sys., Inc.*, 735 F. Supp. 2d 535, 552 (E.D. Tex. 2010) .............................10

## I. Brief Technological Background Summary

By way of introduction, Plaintiff provides this brief overview of the inventions of the Asserted Patents. ElectraLED produces high-quality, energy-efficient, commercial LED lighting products. With a broad and continually developing product offering, ElectraLED provides an array of solutions focused on commercial LED lighting needs. ElectraLED is proud to be made in the U.S.A., and ElectraLED's mission is to provide the most economical, expertly engineered and rigorously tested LED illumination products with unparalleled service and support to customers worldwide. ElectraLED takes pride in the continuous development of new and innovative products to meet the efficiency demands of the future. All ElectraLED lighting systems are designed in-house and every product is subjected to third-party certification testing for safety, longevity and performance.

Broadly and generally, the inventions as claimed solved certain technological problems associated with thermal management of light fixtures. Primarily, the inventions present a novel means of durable light fixtures with improved thermal management properties to ensure reliable operation. More specifically, the '245 Patent contemplates a light fixture which includes a light engine featuring an arrangement of light-emitting diodes (LEDs), a rugged housing, an internal power supply removably embedded within the housing, and an openable rear cover that provides access to the embedded power supply, and the use of fins in a novel way to facilitate heat dissipation.

Before the inventions of the '245 Patent, light fixtures suitable for commercial use, such as in or around building and commercial facilities, were typically designed to be durable since they can be struck or damaged during business operations. To provide this durability, prior art light fixtures typically had substantial housings that protected the light source. Most prior art commercial light fixtures utilized fluorescent bulbs, halogen bulbs, mercury vapor lamps, or metal halide lamps as the light source. However, prior art commercial fixtures suffered from a variety of limitations, including but not limited to,

high cost, low efficiency, high power consumption and/or poor light output quality. Thus, the overall appeal of prior art commercial fixtures was limited, and will further erode as energy costs (and the related operating costs) continue to increase. *See* '245 Patent, Col. 1, ll. 26-44 (for ease of reference, a true and correct copy of the '245 Patent is attached hereto as Exhibit A.

The inventors of the '245 Patent conceived new light fixtures to solve these limitations and to provide advantages and aspects not provided by conventional light fixtures. This is achieved by having a light fixture that includes an LED light engine, which by design, is energy efficient and provides high quality light output. The inventive light fixture includes a rugged housing and an internal power supply that is thermally isolated while residing within the housing. Positioning the power supply within the housing minimizes the opportunity for incurring damage to the power supply. This is of particular importance when the light fixture is configured for use in high-traffic commercial or industrial applications, such as warehouses, loading docks or shipping/receiving areas, where the light fixture is prone to being struck by forklifts and other large objects. While an internal power supply enjoys a reduced chance of being damaged, the power supply is susceptible to failure from heat generated by the light engine. The light fixture of the invention includes several novel heat management features designed to thermally isolate the power supply in order to reduce the risk of failure and thereby increase the reliability of the light fixture. *See* '245 Patent, Col. 1, ll. 48-64.

Another important aspect of the invention is a light fixture which includes a rugged housing with an arrangement of fins extending from the main body portion of the housing and that dissipate heat. During operation, heat generated by the light engine is transferred along a flow path through the main body portion and the fins for dissipation to ambient. *See* '245 Patent, Col. 1, ll. 65-7, Col. 2, ll. 1-7.

## II.   Legal Framework

Plaintiff recognizes that the Court is fully versed on the law as it relates to claim construction and

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF                                                      2

will therefore not burden the Court with an extended recitation of the various rules, canons, and principles. For purposes of the specific terms at issue in this case, however, and based on Defendant's erroneous and artificially-narrow proposed constructions, it is evident to Plaintiff that Defendant intends to (attempt to) import a variety of extraneous and unwarranted limitations into the claims. Of course, to do so is clearly erroneous, and Defendant already knows it.

The law on this issue is clear: While the specification is highly relevant to the claim construction analysis, "it is improper to import limitations from the specification unless the patentee has demonstrated a clear intent to limit claim scope." *Martek Biosci. Corp. v. Nutrinova, Inc.,* 579 F.3d 1363, 1381 (Fed. Cir. 2009). It is the claims, "not specification embodiments," which define the scope of patent protection; "[t]he patentee is entitled to the full scope of his claims" and is not limited "to his preferred embodiment" and the Court will not "import a limitation from the specification into the claims." *Kara Tech Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Comaper Corp. v. Antec, Inc.,* 596 F.3d 1343, 1348 (Fed. Cir. 2010) (cautioning "against confining the claims to [preferred] embodiments"). Even where "a patent describes only a single embodiment, the claims should not be construed as limited to that embodiment" absent a clear disavowal of claim scope. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005); *see also Linear Tech Corp. v. ITC,* 566 F.3d 1049, 1057–58 (Fed. Cir. 2009) (explaining that it is improper to limit a claim to embodiments described in the specification where "there is no clear intention to limit the claim scope").

As the Federal Circuit has explained, District Courts should forgo detailed dictionary analysis during claim construction if the term is commonplace, and "merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004); *see also U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction "is not an obligatory exercise in

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF                                              3

redundancy"); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims").

Against this backdrop, Plaintiff addresses the terms as requested to be construed by Defendant.

### III. Argument

#### A. "a power supply residing within the rear receptacle" ['245 Patent, Claim 21]

The first phrase identified by Defendant is the straightforward limitation which recites: "a power supply residing within the rear receptacle." Such phrase is unremarkable and unambiguous on its face, and is readily understandable to a lay jury. Nevertheless, Defendant proposes a self-serving construction importing unwarranted limitations which seek to rewrite the claims to redefine "rear receptacle" as "the pocket defined by the array of fins."

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "a power supply residing within the rear receptacle" | No construction necessary; plain and ordinary meaning. | "a power supply received within the pocket defined by the array of fins" |

Again, this term has a plain meaning that would be readily understood by a jury and nothing in the specification or prosecution history justifies departing from that plain meaning. First, there is no reason to conjure up a definition from supposed intrinsic and extrinsic evidence for "rear receptacle" since this is a straightforward, everyday, simple phrase. Defendant seems to want to completely ignore the proper approach to claim construction by starting with the actual claim language. *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017) ("As indefiniteness analysis involves general claim construction principles, we begin with the language of the claims."). As noted above, this Court may properly decline to construe a claim term such as this if its plain meaning can be readily understood. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008);

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF                                    4

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*, 694 F.3d 1312, 1325-26 (Fed. Cir. 2012). Merely substituting in a long definition for a very simple phrase – "a power supply residing within the rear receptacle" – would not aid the jury and invites unwarranted ambiguity by inserting the concept of "received within the pocket defined by the array of fins."

Additionally, "residing within the rear receptacle" does not necessarily mean "received within the pocket defined by the array of fins," and there is no justification to narrowly construe it in a manner that is inconsistent with its plain and ordinary meaning. Even if the prosecution history did support this construction in any way, which it clearly does not, the prosecution history can be used to limit the scope of a claim only where there has been a "clear and unmistakable disclaimer" of claim scope. *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) (internal quotes and citations omitted). Because the prosecution history "represents an ongoing negotiation between the PTO and the applicant, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

Defendant's proposed construction should be rejected because it is not consistent with the plain and ordinary meaning and its use of the term "received within the pocket defined by the array of fins" introduces ambiguity into the scope of the claim.

B. **"wherein during operation, heat generated by the LEDs passes through the circuit board and then said heat is dissipated by the array of fins without the use of a fan" ['245 Patent, Claim 21]**

Next, Defendant argues that the following limitation is indefinite: "wherein during operation, heat generated by the LEDs passes through the circuit board and then said heat is dissipated by the array of fins without the use of a fan." This phrase is not indefinite. Because this phrase is subject to reasonable construction, Defendant's argument must be rejected. No construction is required by the Court. *O2 Micro Int'l Ltd.,* 521 F.3d at 1362.

| Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "wherein during operation, heat generated by the LEDs passes through the circuit board and then said heat is dissipated by the array of fins without the use of a fan" | Not indefinite. No construction necessary; plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112. |

As discussed in the Technological Background Summary above, the inventions of the '245 Patent focus in providing durable light fixtures that use LEDs, much of which deals with heat management when positioning the power supply within a rugged housing to minimize the opportunity for incurring damage to the power supply. While an internal power supply enjoys a reduced chance of being damaged, the power supply is susceptible to failure from heat generated by the light engine. The light fixture of the invention includes several novel heat management features designed to thermally isolate the power supply in order to reduce the risk of failure and thereby increase the reliability of the light fixture. *See* '245 Patent, Col. 1, ll. 48-64. Thus, a main focus for the patent is dealing with the heat, and the specification broadly discusses the term "heat" throughout. The light fixture of the invention includes several novel heat management features designed to thermally isolate the power supply in order to reduce the risk of failure and thereby increase the reliability of the light fixture. *See* '245 Patent, Col. 1, ll. 48-64. Another important aspect of the invention is a light fixture which includes a rugged housing with an arrangement of fins extending from the main body portion of the housing and that dissipate heat. During operation, heat generated by the light engine is transferred along a flow path through the main body portion and the fins for dissipation to ambient. *See* '245 Patent, Col. 1, ll. 65-7; Col. 2, ll. 1-7. The specification also discloses other ways to dissipate heat, using heat transfer elements, including the use of thermal pads, grease or gels. *See* '245 Patent, Col. 2, ll. 12-15; Col. 3, ll. 34-37; Col. 4, ll. 14-48; Col. 5, ll. 2-5 and 26-53.

The specification even provides a detailed illustration of how heat is managed in one embodiment:

> The cavity 125 between the main body 45 and the power module 70 exposes the fins 40 proximate the box 30 to cooling air for convective heat transfer, which prevents a significant quantity of heat from transferring to the power supply 25. While a small quantity of heat may be transferred to the bosses 46, the insulator 110 ( such as the elastomeric ring 11) minimizes any further heat transfer to the box 30 and the power supply 25. In some situations, a small amount of heat may eventually be transferred to the power supply 25 via the fasteners 77; however, due to the heat management components of the fixture 10, that amount is relatively low and should not compromise the operation and durability of the power supply 25. As an example of the fixture's heat management capabilities during steady state operation, the LED 17 junction temperature at the circuit board 50 was measured at 55° C., the housing 20 body temperature was 45° C., the ambient temperature was 25° C., and the power supply 25 temperature was 53 ° C. Significantly, the LED 17 junction temperature of 55° C. is far below the 85° C. threshold where initial degeneration begins and the 125° C. level where failure occurs, and the power supply 25 temperature of 53° C. is below the 70° C. threshold where failure may occur. Thus, the fixture's ability to effectively manage the heat generated by the modules Ml-M18 provides a number of benefits, including but not limited to, continuous and reliable operation of the light engine 15 and the power supply 25; consistent, high quality light produced by the modules Ml-M18; and, efficient operation which leads to lower power consumption and operating costs.

*See* '245 Patent, Col. 8, ll. 33-60.

Given these disclosures, a POSITA would understand with reasonable certainty whether "heat generated by the LEDs [that] passes through the circuit board" or "said heat is dissipated by the array of fins without the use of a fan" does not need to provide bounds or qualifications on the term "heat." ('245 Patent, Claim 21.). *Nautilus*, 134 S. Ct. 2120, 2124 (2014); *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1344 (Fed. Cir. 2016). Defendant's expert, Dr. Michael Lebby, confuses breadth with indefiniteness. *See* Declaration of Dr. Michael Lebby, attached hereto as Exhibit B. As Dr. Lebby explains, there are numerous means to manage "heat," and further, that there is no one way to dissipate "all the heat." Lebby Decl., Exhibit B, ¶¶ 26-29. That the claim does not provide bounds to "heat" further does not mean its scope is unbounded. Dr. Lebby recognizes that different implementations may dissipate heat based on different paths. *Id*. This is true, and that is a choice of embodiment rather than evidence of an

indefinite claim term. The subjective choice of an embodiment does not mean the scope of the generated or dissipated heat is subjective.

Further, given the disclosures, a POSITA would understand with reasonable certainty what is meant by dissipating the heat with the array of fins "without the use of a fan." ('245 Patent, Claim 21.). *Nautilus*, 134 S. Ct. 2120, 2124 (2014); *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1344 (Fed. Cir. 2016). As discussed above, the specification provides rich context for the use of fins as one way to manage heat generated by the light engine. *See* '245 Patent, Col. 1, ll. 65-67; Col. 2, ll. 1-7; Col. 3, ll. 26-27; Figs. 3, 4A and 5. The specification even provides a clear explanation that the fins are not the only means to dissipate heat: "The housing 20 includes an arrangement of external fins 40 ***that help the housing 20 dissipate heat*** generated by the light engine 15." *Id.*, Col. 3, ll. 26-28 (emphasis added). Thus, the specification makes it clear there are many ways to dissipate heat, all without the use of a fan. *Id.*, Col. 2, ll. 12-15; Col. 3, ll. 34-37; Col. 4, ll. 14-48; Col. 5, ll. 2-5 and 26-53.

Dr. Lebby's supposed confusion of "whether heat may dissipated by other means can be dissipated with the use of a fan, as long as there is heat dissipated by the fins that does not depend on using a fan" and "whether all heat dissipated by the array of fins must be dissipated without the use of a fan, or whether the claim scope covers using a fan to help dissipate heat with the array of fins as long as some fins dissipate heat without the use of the fan" is unsupported. Lebby Decl., Exhibit B, ¶¶ 30-31. Here, any alleged lack of antecedent basis of "all heat," "some heat," "all" fins" or "some fins," by itself, does not demand a finding of indefiniteness. "[D]espite the absence of explicit antecedent basis, '[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite.'" *Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006); *see also In re Downing*, 754 F. App'x at 996 ("But the lack of an antecedent basis does not render a claim indefinite as long as the claim 'apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by [§ 112 ¶

2].'"). Further, "an antecedent basis can be present by implication." *Energizer*, 435 F.3d at 1371. "For example, the lack of clarity could arise where a claim refers to 'said lever' or 'the lever,' where the claim contains no earlier recitation or limitation of a lever, and where it would be unclear as to what element the limitation was referring." *In re Downing*, 754 F. App'x at 996 (citing MPEP § 2173.05(e)). "Thus, a claim term that lacks an antecedent basis may, but does not necessarily, render a claim indefinite." *Id.*; *see also Energizer*, 435 F.3d at 1370-71 (finding that "an anode gel comprised of zinc as the active anode component" provided an implicit antecedent basis for "said zinc anode"). Defendant must show by "clear and convincing showing that one of ordinary skill cannot reasonably ascertain claim scope." *Optimum Imaging Techs. LLC v. Canon Inc.*, No. 2:19-CV00246-JRG, 2020 WL 3104290, at *9 (E.D. Tex. June 11, 2020) (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014)).

Here, as discussed, the specification discloses and Dr. Lebby acknowledges that there is no all-in-one means to dissipate heat. *See* '245 Patent Col. 2, ll. 12-15; Col. 3, ll. 34-37; Col. 4, ll. 14-48; Col. 5, ll. 2-5 and 26-53; Lebby Decl., Exhibit B, ¶¶ 26-29. Thus, the "heat generated by the LEDs" at the beginning of the limitation is not limited to be "all heat" or "some heat," nor does it limit the use of "all" fins" or "some fins."

Further, Dr. Lebby himself admits there are different embodiments possible for the use of a fan, "including having no fan installed." *Id.*, ¶ 31 ("There are many configurations that a light fixture could have, including having no fan installed, a fan installed on a location that is away from the heat flow path to the fins, or a fan installed along the flow path that could be configured not to dissipate heat. The configurations further diversify depending on the purpose, size, and location of an installed fan."). Again, the subjective choice of an embodiment does not mean that "without the use of a fan" is indefinite.

Applicants are entitled to the full scope of their invention if the specification supports it. Nothing prohibits the claimed "without the use of a fan" from being completely without the use of a fan, or have

"a fan installed on a location that is away from the heat flow path to the fins, or a fan installed along the flow path that could be configured not to dissipate heat." *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004) ("A patentee may claim an invention broadly and expect enforcement of the full scope of that language…"); *US Foam, Inc. v. On Site Gas Sys., Inc.*, 735 F. Supp. 2d 535, 552 (E.D. Tex. 2010) ("The patentee is entitled to broadly claim his invention so that he captures all manner of agents without having to identify each individually."); *see also Sonix Tech. Co.*, 844 F.3d at 1378 (Fed. Cir. 2017) ("As indefiniteness analysis involves general claim construction principles, we begin with the language of the claims.").

For these reasons, Defendant and its expert, Dr. Lebby, have failed to demonstrate that "wherein during operation, heat generated by the LEDs passes through the circuit board and then said heat is dissipated by the array of fins without the use of a fan" is indefinite by clear and convincing evidence.

## IV. Conclusion

Defendant's erroneous proposed constructions should be rejected, and Plaintiff's should be accepted for all the reasons set forth above.

//

| | |
|---|---|
| Dated: August 29, 2025 | Respectfully Submitted |
| | */s/ Christopher A. Honea* |
| | M. Scott Fuller |
| |    Texas Bar No. 24036607 |
| |    sfuller@ghiplaw.com |
| | Randall Garteiser |
| |    Texas Bar No. 24038912 |
| |    rgarteiser@ghiplaw.com |
| | Christopher A. Honea |
| |    Texas Bar No. 24059967 |
| |    chonea@ghiplaw.com |
| | |
| | **GARTEISER HONEA, PLLC** |
| | 119 W. Ferguson Street |
| | Tyler, Texas 75702 |
| | Telephone: (903) 705-7420 |
| | Facsimile: (888) 908-4400 |
| | |
| | **ATTORNEYS FOR PLAINTIFF ELECTRALED, INC.** |